# Exhibit C

| APPROVALS |   |
|---|---|
| Legal: | |
| Finance: | |
| Executive: | |

# MAGNACARE℠

## MAGNACARE SERVICES AGREEMENT

This Agreement is between **MagnaCare Administrative Services, LLC** ("MagnaCare") located at One Penn Plaza, Suite 2000, New York, NY 10119 and **Allied Welfare Fund** ("Client"), located at 2556 Arthur Kill Road Staten Island, NY 10309.

This Agreement consists of:

> This **Signature Page and the Master Agreement Terms and Conditions;**
> and one or more of the following:
> > ☑ **Service Attachment A** - MagnaCare Network Access Agreement Terms and Conditions
> > > ☑ **Exhibit A1** - Medical, Diagnostic and Hospital Network Access Rates
> > > ☑ **Exhibit A2** - Business Associate Agreement.

Effective Date As of: 5/1/2006       ☑ New York and New Jersey MagnaCare Medical and Hospital Networks:
(other effective date _____)

| MagnaCare Administrative Services, LLC<br>One Penn Plaza, Suite 2000<br>New York, NY 10119 | Allied Welfare Fund<br>2556 Arthur Kill Road<br>Staten Island, NY 10309 |
|---|---|
| By: *[signature]* | By: |
| Name: James Cusumano | Name: |
| Title: Chief Financial Officer | Title: Union Trustee *[signature]* |
|  | By: |
|  | Name: |
|  | Title: Employer Trustee *[signature]* |
| Date: | Date: |

*T- Legal/ Contracts /Client Services Agreement PPO Allied Welfare Fund-clean-5_20_10*

- 1 -

## MASTER AGREEMENT TERMS AND CONDITIONS (FOR ALL PRODUCTS)

### Definitions.

1.1 "**Affiliate**" means an entity related by common ownership, management or control.

1.2 "**Business Day**" means any day other than a Saturday, Sunday or holiday under federal law or the law of New York State.

1.3 "**Clean Claim**" means any claim for payment received from a provider which includes a properly completed HCFA (or CMS) Form 1500 or UB-92 (or other HIPAA Compliant standard claims form providing the same information) claim form and which, for proper adjudication, does not require medical records or information regarding benefit entitlement, or any action with respect to coordination of benefits, if any, with any other payor determined to be primary.

1.4 "**Covered Services**" means those health care services received by an Eligible Person which are eligible for payment pursuant to the terms of Client's Health Benefit Plan.

1.5 "**Eligible Person**" means a person who is enrolled in, and eligible to receive benefits under Client's Health Benefit Plan.

1.6 "**Health Benefit Plan**" means the self-funded health benefit plan provided or administered by Client.

1.7 "**Participating Provider**" means a health care professional, provider or facility that has contracted with MagnaCare or one of its Affiliates to provide Covered Services to Eligible Persons at a discounted rate.

1.8 "**PPO**" means the MagnaCare preferred provider organization accessed by Client.

### 2. Term and Termination.

2.1 **Term**. This Agreement shall commence on the Effective Date set forth on the Cover Page and shall continue for one (1) year. Thereafter, the Agreement shall automatically renew for successive one (1) year terms on each anniversary of the Effective Date unless either Party terminates this Agreement pursuant to this Article 2. Either Party may terminate any Service Attachment hereto, or service provided thereunder, in the same manner as it would terminate this Agreement, provided, however, that such termination shall not affect: (i) services not made the subject of such termination, which shall remain in force; and (ii) any obligations which may, by their nature, survive termination.

2.2 **Termination without Cause.** This Agreement may be terminated at any time without cause by either of the Parties upon not less than ninety (90) days' prior written notice to the other Party. Any such written notice shall designate the intended date of termination.

2.3 **Termination with Cause.**

2.3.1. Either Party may terminate this Agreement upon written notice to the other party for cause in the event of a material default by the other party in the performance of any of the obligations under this Agreement which default is not satisfactorily cured within thirty (30) days of receipt of written notice of said default.

2.3.2 Either Party may terminate this Agreement upon five (5) days written notice in the event of: (i) the threatened insolvency of the other Party, (ii) the filing of an involuntary petition against the other Party seeking its adjudication of bankruptcy or insolvency or a reorganization of its debt, or (iii) the other Party commencing a voluntary proceeding seeking adjudication of its bankruptcy or insolvency or a reorganization of its debt.

2.3.3 Either Party may terminate this Agreement if performance by such Party of its obligations hereunder is prevented by regulatory action, acts of God, war, terrorism, earthquakes,

2.6.2 **Eligible Person's Confidential Medical Records.** The Parties agree that they must review Eligible Person's medical records in order to meet their respective obligations under this Agreement. The Parties further agree that medical records will be treated as confidential information and that Client will obtain all necessary medical record releases.

2.7 **Relationship of the Parties; Independent Contractors.**

2.7.1 The parties to this Agreement are independent contractors and nothing herein shall be deemed to create a separate corporation, or a merger or partnership of the Parties, nor shall anything be deemed to imply or create a master-servant, employer-employee, or principal-agent relationship between the Parties. None of the Parties to this Agreement, nor any of their respective officers, directors or employees shall be construed to be the agent, employee or representative of any other except as may otherwise be described in the Agreement. No Party is authorized to speak on behalf of any other for any purpose whatsoever without the prior, written consent of the other Party.

2.7.2 Except as specifically set forth herein, MagnaCare is only liable for its own individual actions under this Agreement.

2.7.3 The relationship between MagnaCare and the Participating Providers is an independent contractor relationship. Participating Providers and their employees and agents are not employees or agents of MagnaCare and neither MagnaCare nor any employee of MagnaCare is an employee or agent of the Participating Providers. MagnaCare is not responsible and shall not be liable for any claims that may arise from the provision of medical and/or hospital services to Eligible Persons by Participating Providers.

2.7.4 For purposes of the Employee Retirement Income Security Act of 1974 **("ERISA")**, and any applicable state laws of a similar nature, Client (or, if Client is a TPA, its customer health benefit plan[s]) shall be deemed to be the "Plan Sponsor" and "Administrator" of the of the Health Benefit Plan, as those terms are defined in ERISA, unless Client designates an individual or committee to act as administrator. Client (or, if Client is a TPA, its customer health benefit plan[s]) is the named fiduciary with respect to the Health Benefit Plan. In no instance shall MagnaCare be, or be deemed to be, a fiduciary of Client's Health Benefit Plan.

2.8 **Compliance with Laws; Licensing.**

2.8.1 Each Party shall be responsible for maintaining, and shall maintain, its compliance in all material respects with state and federal laws and regulations that may apply to its operation and licensing and its performance under this Agreement. Each Party shall procure and maintain all licenses necessary for its continued operation and shall immediately notify the other Party, in writing, of the commencement of any action initiated against it which might result in the loss or suspension of any such license or otherwise affect or impair its ability to perform its obligations under this Agreement.

2.8.2 **ERISA, COBRA, etc.** Client (or, if Client is a TPA, its customer health benefit plan[s]) acknowledges that it and its designees (excluding MagnaCare), shall be fully responsible for plan design and continued compliance with all provisions of applicable federal, state and local laws, including, but not limited to: ERISA; the Internal Revenue Code of 1986, as amended; the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended **("COBRA")**; the Family and Medical Leave Act of 1983, as amended; the Mental Health Parity Act of 1996, as may be amended; the Newborns' and Mothers' Health Protection Act of 1996, as may be amended; the Deficit Reduction Act of 1984, as amended; the Tax Equity and Fiscal Responsibility Act of 1982, as amended; and the laws of New York State, including the Tax Law, the Insurance Law, the Public Health Law, and the Abandoned Property Law and similar laws of other states as may be applicable.

2.8.3 **HIPAA.** Notwithstanding the forgoing, to the extent applicable to MagnaCare, MagnaCare warrants that it shall render services and utilize individually identifiable patient information pertaining to the treatment and payment for services rendered under this Agreement in accordance with HIPAA. MagnaCare further acknowledges that, following the compliance date of the relevant provisions of HIPAA, if MagnaCare should be a

**Attachment A**
**MAGNACARE NETWORK ACCESS**
**AGREEMENT TERMS AND CONDITIONS**

1.0 **Additional Definitions.**

1.01 "**Hospital Services**" shall mean those services or supplies which are ordinarily and customarily provided by a hospital under a hospital facility license issued by either the State of New York or the State of New Jersey.

1.0.2 "**PPO Fee Schedule(s)**" mean(s) the discounted fees that Participating Providers have agreed to accept as payment in full for Covered Services rendered to Eligible Persons under a Health Benefit Plan, subject to coinsurance, copayments and deductibles. The PPO Fee Schedules are composed of a medical fee schedule, diagnostic fee schedule and a hospital fee schedule.

1.0.3 "**PPO Network**" means the network of Participating Providers who have contracted with MagnaCare to provide Covered Services to Eligible Persons. The PPO network includes a network of medical Participating Providers, a network of diagnostic Participating Providers and a network of hospital and facility Participating Providers.

1.0.4 "**Participating Provider**" as used in this Attachment is divided into three categories:

a) Preferred Medical Providers which are individual practitioners, or other health care professionals or providers which have contracted with MagnaCare to provide Covered Services to Eligible Persons at a discounted rate; and

b) Preferred Diagnostic Providers which refers to any laboratory, x-ray facility, outpatient cardiology facility (or any other out-patient facility which renders diagnostic services), home IV infusion Company which have executed agreements with MagnaCare to provide Covered Services to Eligible Persons at a discounted rate (the "Diagnostic Fees").

c) Preferred Network Hospitals, which refers to general, acute care hospitals or facilities licensed by the State in which they are located, accredited by the Joint Commission on Accreditation of Healthcare Organizations, which have entered into a network hospital agreement with MagnaCare.

1.1. **Provider Contracting Services.** MagnaCare has and will arrange through contracts with Participating Providers or entities contracting on behalf of such Participating Providers for the reasonable availability of Covered Services from health care providers to Eligible Persons ("Provider Contracting Services") in the States of New York and New Jersey (the "Service Area"). MagnaCare reserves the right to terminate or modify any provider agreement, including the rates contained therein, without notice to Clients. MagnaCare shall provide Client with the data relating to Participating Providers (including names, addresses, telephone numbers, and, when applicable, respective specialties), which data may be revised by MagnaCare from time to time. Client may include the names, addresses, telephone numbers and the specialties of Participating Providers in any roster it prepares for distribution to Eligible Persons and in connection with Client's marketing and administration of the Health Benefit Plan. All written materials to be distributed by Client utilizing the name and/or logo of MagnaCare must be approved by MagnaCare in advance of distribution.

1.2 **Exclusivity.** Client agrees that Client will not contract with any other organization to provide primary PPO access services similar to those provided by MagnaCare for Eligible Persons who live or work in MagnaCare's Service Area during the term of this Agreement. Client shall not offer competing primary PPO products to Eligible Persons in the Service Area if such Eligible Persons are utilizing the MagnaCare network.

1.3 **Compensation To MagnaCare.**

1.3.1 **Medical PPO Access Fees.** For accessing the MagnaCare Medical PPO Network, Client (or, if Client is a TPA, Client on behalf of its customer) shall pay to MagnaCare the monthly access fee set forth in Attachment A-1, which is

subject to modification upon thirty (30) days notice. Payment shall be for the next calendar month and shall be due and payable to MagnaCare no later than the fifth (5th) day of each month for which such service is billed and, if on a Per Eligible Person Per Month ("PEPM") basis, shall be accompanied by the Client's certification of the number of Eligible Persons (excluding dependents) enrolled under the Health Benefit Plans during the preceding calendar month. If billed on a PEPM basis, Client shall notify MagnaCare of any additional Eligible Persons enrolled under the Health Benefits Plans by the thirtieth (30th) day of such month and a fee adjustment shall be made in the monthly fee due for such month. Client shall pay this adjustment together with the monthly fee due for the next month. If not billed on a PEPM basis (*i.e.*, a percentage of savings basis), Client shall provide to MagnaCare a monthly report demonstrating all claims against which a discount was taken and the derivation of all percentage of savings calculations.

1.3.2 **Diagnostic PPO Network Fees.** MagnaCare, LLC utilizes a diagnostic Fee Schedule (which is part of the PPO Fee Schedules) which will be accepted by diagnostic Participating Providers with respect to the rendering of Covered Services to Eligible Person. Fees charged to Client will include a management portion payable to MagnaCare in addition to the diagnostic Fee Schedule amount payable to the diagnostic Participating Provider. For services rendered to Eligible Persons by diagnostic Participating Providers, Client shall pay to MagnaCare the Diagnostic Fees, which, upon MagnaCare's receipt shall not be considered for any purposes as Health Benefit Plan assets. MagnaCare will then retain the management portion from the diagnostic fee and will then remit the remaining amount to the Diagnostic Participating Provider. Diagnostic Participating Providers shall be required to prepare and submit all claims for reimbursement of Covered Services rendered to Eligible Persons directly to MagnaCare. After review with medical intelligence software and Repricing, MagnaCare, acting as the disbursing agent for its Participating Providers and not as a fiduciary of the Client, shall forward all claims and the data resulting from medical intelligence software review and Repricing directly to Client so that Client can determine benefits and fund claims payment to MagnaCare. MagnaCare shall then be responsible for remitting the applicable payment from the diagnostic fee schedule to the diagnostic Participating Providers. In determining diagnostic payment, MagnaCare shall be performing ministerial and not a discretionary function. Client shall make all claims payment determinations in accordance with its Health Benefit Plan design. Plan shall have final discretionary authority over its benefit plan.

1.3.3 **Hospital Network Access Fees.** For accessing the MagnaCare Entities' Participating Hospital networks, Client (or, where Client is a TPA, Client on behalf of its customer) shall pay to MagnaCare the monthly access fees set forth in attached Exhibit A1, which is subject to modification upon thirty (30) days notice. Payment shall be for the next calendar month and shall be due and payable to MagnaCare no later than the fifth (5th) day of each month for which such service is billed and, if on a Per Eligible Person Per Month ("PEPM") basis, shall be accompanied by the Client's certification of Client of the number of Eligible Persons (excluding dependents) enrolled under the Health Benefit Plans during the next calendar month. If billed on a PEPM basis, Client shall notify MagnaCare of any additional Eligible Persons enrolled under the Health Benefits Plans by the thirtieth (30th) day of such month and a fee adjustment shall be made in the monthly fee due for such month. Client shall pay this adjustment together with the monthly fee due for the next month. If not billed on a PEPM basis (*i.e.*, a percentage of savings basis), Client shall provide to MagnaCare a monthly report demonstrating all claims against which a discount was taken and the derivation of all percentage of savings calculations. The foregoing shall not be required where MagnaCare pays claims for Client.

1.4 **Collection Of Fees, Reconciliation.** In the case of underpayment, Client shall within ten (10) days of notice pay said underpayment to MagnaCare. In the case of an overpayment, MagnaCare shall, within ten (10) days of notice pay said overpayment to Client. MagnaCare shall have the right to inspect and audit Client's enrollment records. Client shall pay to MagnaCare a late charge in the amount of one and one-half percent (1.5%) per month for any late payment. Client shall also pay all expenses incurred by MagnaCare in connection with the collection of such fees, including, without limitation, attorneys'

fees (regardless of whether an action is filed) and court costs. In the event Client is a TPA, then it shall be responsible to pay to MagnaCare all access fees set forth herein regardless of whether it receives payment for the same from Health Benefit Plan.

1.5 **Eligible Persons.** Client and/or Health Benefit Plan has established eligibility requirements for participation of Eligible Persons in the Health Benefit Plan. Client shall provide each Eligible Person with an Identification Card which shall include the logo and name of MagnaCare. The Eligible Person Identification Card shall contain information describing the amount of copayment, if any, for which the Eligible Person is responsible. Client shall provide MagnaCare and Participating Providers with a toll-free telephone number for their use during the Client's normal hours of business for the purpose of verifying Eligible Person eligibility and the type of benefits for which the Eligible Person is eligible. Client agrees to certify or obtain certificates as to the number of Eligible Persons in each Health Benefit Plan, including the name, address and identification numbers therefor. Such certification shall be provided to MagnaCare at the time such Health Benefit Plan is added and on a monthly basis as supporting documentation for Client's payment of the monthly compensation under this Agreement.

1.6 **Payment of Participating Providers.**

1.6.1 MagnaCare shall require all medical Participating Providers to prepare and submit all claims for reimbursement of Covered Services rendered to Eligible Persons directly to MagnaCare for medical intelligence software review and repricing. After completion of these functions, MagnaCare shall forward all claims and the data resulting from medical intelligence software review and repricing directly to Client so that Client can make payment directly to medical Participating Providers. Client shall make all claims payment determinations in accordance with its Health Benefit Plan design. For Clean Claims, payment shall be made by Client (for itself or, where Client is a TPA, on behalf of its customer) as determined by MagnaCare through its repricing, within thirty (30) days from the date that such Clean Claim(s) is/are received by the entity designated on the Client's Identification Card as the initial recipient of Client's claims. For other than Clean Claims, payment shall be made within thirty (30) days of receipt of all records and other information (including coordination of benefits information) necessary for proper claims adjudication. Client shall request medical records and other documentation only if reasonably required by it for accurate benefit determination. Participating Providers may bill Eligible Persons directly for coinsurance amounts, copayments and deductibles, and non contractually covered services. If a Clean Claim is not paid in accordance with this Section, Participating Providers shall be entitled to bill Eligible Persons for such claims at the Participating Providers' usual and customary rate or, in the case of a hospital, at billed charges without any discount. Client shall include, with each payment, in the Explanation of Benefits, a message to the Participating Provider that the remittance is for Covered Services rendered to an Eligible Person at the MagnaCare rate. MagnaCare may at its option, terminate a Client and/or Health Benefit Plan which fails to make timely payment to Participating Providers. Client shall pay clean claims at the MagnaCare rate for in-network Covered Services.

1.6.2 Except in cases of emergency, or unless otherwise agreed to by the Parties, Client agrees to follow the utilization management protocols employed by MagnaCare pursuant to the terms and conditions of the provider agreements entered into by such entities, including as they relate to pre-certification, case management and hospital admission notification.

1.6.3 If Client's liability under this Agreement is covered by reinsurance, Client represents and warrants that the reinsurer periodically audits and certifies Client's ability to pay claims that are due and, in the case of the Client's insolvency, will pay all claims due under this Agreement as if the reinsurer was the primary obligor. If Client is not otherwise covered by reinsurance, it represents and warrants that it has sufficient money on hand to pay all claims that it reasonably anticipates will accrue over the three month period that follows the execution of this Agreement and that at any point during the term of this Agreement it shall have a reserve fund sufficient to pay all claims that it reasonably can anticipate will accrue during the three (3) month period which follows.

1.7 **Coordination of Benefits.** If any Eligible Person shall be entitled to payment or benefits from any source other than Client for services rendered by a Participating Provider, the relative obligations of Client and the other sources shall be determined by Client in accordance with the terms of the Health Benefit Plans covering said services and applicable law. In no event shall Client's payment to a Participating Provider pursuant to this Agreement, when added to the payment received by the Participating Provider from any other payor, exceed the amount payable under PPO Fee Schedules.

1.8 **Promotion of the MagnaCare Entities.** Client represents and warrants that it has adopted, or will adopt, certain financial incentives, including reduced copayments and/or deductibles for Covered Services rendered by which are obtained from Participating Providers, which incentives shall be intended to encourage Eligible Persons to utilize a Participating Provider. Where Client is a TPA, Client shall use its best efforts to ensure that its customers accessing MagnaCare employ such incentives to encourage in-network usage.

1.9 **Use Of Rates.** Client represents and warrants that the PPO Fee Schedules made available to Eligible Persons shall be utilized exclusively therefor and for no other person or purpose. In the event MagnaCare determines that a PPO Fee Schedule was not appropriately applied when making a claim payment, Client will make a reasonable effort to correct any error identified and promptly readjudicate the claim.

1.10 **New York Hospital Surcharge Payments.** MagnaCare's extension to Client of the PPO Fee Schedule for New York hospitals and facilities is based on the election of Client to pay directly into the pools for the financing of "public goods," i.e., indigent care and graduate medical education (GME) pursuant to the New York Health Care Reform Act of 1996.

1.11 **Access By Client Which Is A TPA.** In the event that client is a Third Party Administrator, Client represents and warrants that it is authorized to enter into this agreement on behalf of the plans for which serves as administrator, and that each such entity will demonstrate its agreement to be bound by this Agreement as if it were a direct signatory by executing a joinder agreement for each Health Benefit Plan for whom Client performs administration. Such plan shall be obligated to perform the payment and other duties enumerated herein and shall be liable to MagnaCare for any breach of such duties. Client shall, upon execution of this Agreement, and monthly thereafter in a separate writing such as that attached hereto, furnish MagnaCare with the names of each fund which will access the PPO Fee Schedule(s). Client shall notify Eligible Persons of any termination of this Attachment or the Agreement.

1.12 **Recoveries Data Mining.** MagnaCare may engage the services of outside vendors to recover overpayments or incorrect payments to providers. Such vendors shall be compensated on a percentage of savings basis. MagnaCare may also engage vendors to undertake data mining on Client's behalf.

1.13 **Integration.** This Attachment is made a part of, and incorporated into the Agreement in its entirety.

Initial Here: ____(Client) ____(MagnaCare)

**THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

*T- Legal/ Contracts /Client Services Agreement PPO Allied Welfare Fund-clean-5_20_10*

## VI. Term and Termination.

### A) General Term and Termination

This Agreement shall become effective on the Effective Date set forth above and shall terminate upon the termination or expiration of the Service Agreement and when all Protected Health Information provided by either party to the other, or created or received by Business Associate on behalf of Covered Entity is, in accordance with Section VII below, destroyed or returned to Covered Entity or, if it is not feasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the terms of this Agreement.

### B) Material breach

Where either Party has knowledge of a material breach by the other Party, and cure is possible, the non-breaching Party shall provide the breaching Party with an opportunity to cure. Where said breach is not cured within ten (10) business days of the breaching Party's receipt of notice from the non-breaching Party of said breach, the non-breaching Party shall terminate the portion of the Service Agreement that is affected by the breach.

In the event that ether Party has knowledge of a material breach of this Agreement by the other Party, and cure is not possible, the non-breaching Party shall terminate the portion of the Service Agreement that is affected by the breach. When neither cure nor termination is feasible, the non-breaching Party shall report the violation to the Secretary.

## VII. Return/Destruction of Protected Health Information Upon Termination.

Upon termination of this Agreement for any reason, Business Associate shall:

(a) if feasible, return or destroy all Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity that Business Associate or any of its subcontractors and agents still maintain in any form, and Business Associate shall retain no copies of such information; or

(b) if Business Associate and Covered Entity determine that such return or destruction is not feasible, extend the protections of this Agreement to such information and limit further uses and disclosures to those purposes that make the return or destruction of the Protected Health Information infeasible, in which case Business Associate's obligations under this Section shall survive the termination of this Agreement.

## VIII. Amendment.

If any of the regulations promulgated under HIPAA or the HITECH Act are amended or interpreted in a manner that renders this Agreement inconsistent therewith, the Parties shall amend this Agreement to the extent necessary to comply with such amendments or interpretations.

## IX. Conflicting Terms.

In the event any terms of this Agreement conflict with any terms of the Service Agreement, the terms of this Agreement shall govern and control.

## X. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the state under which the Service Agreement is governed.

IX. Notices.

All notices, requests, approvals, demands and other communications required or permitted to be given under this Agreement shall be in writing and delivered either personally, or by certified mail with postage prepaid and return receipt requested, or by overnight courier to the party to be notified. All communications will be deemed given when received. The addresses of the parties shall be as follows; or as otherwise designated by any party through notice to the other party:

If to Covered Entity:

Allied Welfare Fund
c/o Crossroads Healthcare Management
2556 Arthur Kill Road
Staten Island, NY 10309
Attn: Pat Paolucci, EVP & COO, Crossroads Healthcare Management

If to Business Associate:

MagnaCare Administrative Services, LLC
One Penn Plaza, Suite 2000
New York, NY 10119
Attn: Joseph Berardo, Jr., President and CEO

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement on behalf of the party and on the date set forth below.

| Covered Entity:<br>Allied Welfare Fund<br><br>By: _____<br>     Union Trustee<br><br>By: _____<br>     Employer Trustee<br><br>Date: _____ | Business Associate:<br>MagnaCare Administrative Services, LLC<br><br>By: _____<br><br>Print: James Cusumano<br><br>Title: Chief Financial Officer<br><br>Date: _____ |

*T- Legal Contracts /Client Services Agreement PPO Allied Welfare Fund-clean-5_20_10*

- 19 -